1
UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

2

3
------------------------------------------------------------
                                    )
Prime Therapeutics, LLC,            )   File No. 22-mc-35

4                                   )            (WMW-JFD)
                                    )
        Movant,                     )

5                                   )
vs.                                 )   St. Paul, Minnesota

6                                   )   September 29, 2022
CVS Pharmacy, Inc., and CVS         )   1:59 p.m.

7   Health Corporation,             )
                                    )

8       Respondents.                )
------------------------------------------------------------

9

10
BEFORE THE HONORABLE JOHN F. DOCHERTY
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

11
**(MOTION HEARING)**

12
<u>APPEARANCES</u>
  For the Movant:          Forsgren Fisher McCalmont

13                         DeMarea Tysver LLP
                           VIRGINIA R. MCCALMONT, ESQ.

14                         Capella Tower
                           225 South Sixth Street

15                         Suite 1750
                           Minneapolis, Minnesota 55402

16
  For the Respondents:     Williams & Connolly LLP

17                         ANDREW GUIANG, ESQ.
                           GRANT GEYERMAN, ESQ.

18                         680 Maine Avenue SW
                           Washington, DC 20024

19
                           Skolnick & Bardwell, P.A.

20                         SAMUEL JOHNSON, ESQ.
                           333 South Seventh Street

21                         Suite 1150
                           Minneapolis, Minnesota 55402

22
  Court Reporter:          ERIN D. DROST, RMR-CRR

23                         Suite 146
                           316 North Robert Street

24                         St. Paul, Minnesota 55101

25
     Proceedings recorded by mechanical stenography;
  transcript produced by computer.

**P R O C E E D I N G S**

**IN OPEN COURT**

1

2

3

4          THE COURT:  So we're here for a hearing on the

5   case of Prime Therapeutics v. CVS Pharmacy.  File Number is

6   22-mc-35.

7          Let's get appearances beginning with counsel for

8   the movant, Prime Therapeutics.

9          MS. MCCALMONT:  Good afternoon, Your Honor.  Would

10   you like us to remain seated at the counsel's table or --

11          THE COURT:  That's fine.  I think, you know, one

12   of the counsel does have some illness in their family, and

13   so I thought that we should probably stay masked today.  If

14   you are over there by yourself and it becomes a problem

15   understanding, I think you could take your mask off.  I may

16   do -- I may do the same.  But to the extent possible, given

17   the circumstances, and I'm grateful to counsel for bringing

18   it to our attention, I think that we should do our most --

19   the most we can within the limits of understandability to

20   keep safe today.  So --

21          MS. MCCALMONT:  Understood, Your Honor.  Thank

22   you.  I just didn't want to show disrespect by not standing

23   up.

24          THE COURT:  No, no, no.  Don't worry about that.

25          MS. MCCALMONT:  So I am Virginia McCalmont,

```
1    Your Honor, of Forsgren, Fisher, McCalmont, DeMarea, and

2    Tysver on behalf of movant Prime Therapeutics.

3              THE COURT:  Okay.  Good afternoon.

4         And for CVS?

5              MR. GEYERMAN:  Good afternoon, Your Honor.  Grant

6    Geyerman from Williams & Connolly for CVS.

7              THE COURT:  Good afternoon.  And who's with you,

8    Mr. Geyerman, at the table?  I see --

9              MR. GEYERMAN:  I'll let them introduce themselves

10   if that's okay.

11             THE COURT:  Yes, I jumped the gun.

12             MR. GUIANG:  Good afternoon, Your Honor.  Andrew

13   Guiang here from Williams & Connolly on behalf of CVS

14   Pharmacy.

15             THE COURT:  Okay.

16             MR. JOHNSON:  Sam Johnson with the firm Skolnick &

17   Bardwell appearing as local counsel.

18             THE COURT:  Okay.  Good afternoon to all of you.

19        Just to -- before we get started, going through

20   the materials here, I have a number of questions.  There are

21   some things that are -- let's just say I need to get them

22   clarified.  I think I know the answers to some questions.

23   But in other areas, I'm genuinely rather puzzled.

24        And so we'll -- you know, we'll begin with counsel

25   for Prime, but I'll just say that anticipate more than the
```

 1    usual number of questions and even questions that might be

 2    changing the topic that you are talking on.

 3              So with that, you have the floor.

 4              MS. MCCALMONT:  Thank you, Your Honor.  Virginia

 5    McCalmont on behalf of Prime Therapeutics.  I was intending

 6    to address three issues briefly this afternoon, so --

 7              THE COURT:  Sure.

 8              MS. MCCALMONT:  -- first the motion to quash

 9    Request 2, which is the request that relates to the response

10    to proposal documents.

11              THE COURT:  Right.

12              MS. MCCALMONT:  The motion to quash is the part --

13    the part of the motion that relates to cost shifting, and

14    then very briefly the motion to compel.  Please do feel free

15    to interrupt with questions at any time, Your Honor.

16              THE COURT:  Oh, I will, yeah.

17              MS. MCCALMONT:  So beginning then with the motion

18    to quash Request 2, as I noted, that request relates to or

19    requested each response by Prime to any request for

20    proposal, or RFP as the parties call it, during a 16-year

21    period as it relates to any plaintiff in the CVS action.

22              THE COURT:  Now, that was -- 16 years was the way

23    that that subpoena was originally served.  But I do note in

24    the motion papers that there's been extensive negotiation

25    over this subpoena.  Has that been narrowed down at all?

1          MS. MCCALMONT:  There has been extensive

2     negotiation but not as to the date range.

3          THE COURT:  Not as to the date range.  Okay.

4          And the other question I've got with respect to

5     RFP 2 was I wanted to understand what looks like a

6     methodology that you are using as a proxy for irrelevance.

7     I'll have to confess, I spent considerable time trying to

8     understand the relationship between the 1,920 documents and

9     the 236 documents.  And I think I've got it, which is that

10    your client looked for documents responsive to RFP Number 2,

11    found 1,920, thought that they were probably irrelevant to

12    this case, and to test that hypothesis, ran CVS's search

13    terms against those 1,920, and there were 236 documents that

14    hit.

15         Am I even close?

16         MS. MCCALMONT:  That's exactly right, Your Honor.

17    The only slight tweak is we only ran the U & C related

18    search terms.  We didn't run the entire set of search terms.

19    So just that one that was focused on U & C because we

20    thought that was the one that was most likely to generate --

21    to the extent there were relevant hits, that that would be

22    the one that would identify those within the document set.

23         THE COURT:  But these were not search terms, or

24    were they, that CVS had proposed specific to RFP Number 2.

25    These were general search terms for all, I think, 16

1    components of this subpoena?

2              MS. MCCALMONT:  That's correct, Your Honor.

3              THE COURT:  Okay.  So what does then this ratio of

4    236 to 1920 really tell us about relevance or irrelevance?

5    What are the limits of what we can take this for?

6              MS. MCCALMONT:  That's a fair question,

7    Your Honor.  I think from our perspective, when we have had

8    discussions with CVS's counsel, we had asked what the

9    relevance of the full Request 2 was, what exactly it was

10   related to the case -- or that made that request relevant

11   for the case.  And the answer that we got was specific to

12   U & C.  So what we were told is to the extent that Prime was

13   responding in its response -- or, yeah, responses to

14   proposals from plaintiffs by discussing how it approached

15   the U & C pricing methodology, what was or wasn't included,

16   that that sort of discussion is what would render those

17   materials relevant.  So I do think that the use of the U & C

18   search term is a reasonable proxy for relevant materials

19   within the set, at least as far as I understand CVS

20   counsel's argument for why those materials would be relevant

21   at all.

22             THE COURT:  All right.  And when we talk about

23   RFPs and response -- or responses to RFPs, excuse me, are we

24   talking about a set of responses that is limited to

25   responses to the plaintiffs in this case?

1          MS. MCCALMONT:  I believe that is correct,

2     Your Honor.  That's certainly how the request was phrased,

3     and so I believe that is how we attempted to collect

4     documents.

5          THE COURT:  And when you say "I believe," is there

6     some tentativeness to that response?

7          MS. MCCALMONT:  We have not reviewed the 1,920

8     documents, so I wouldn't be able to say with certainty that

9     there wouldn't be materials in there --

10          THE COURT:  I see.

11          MS. MCCALMONT:  -- that would be for --

12          THE COURT:  Somebody else.

13          MS. MCCALMONT:  But my understanding of how we

14     attempted to collect it is that that should be true that

15     those are limited to the plaintiffs in this case.

16          THE COURT:  Okay.  And then my last question, and

17     then I'll let you get back to, you know, the presentation

18     that I'm sure you spent time preparing, when -- throughout

19     your papers, there is a -- a recurring statement that after

20     all, Prime is not a party to this case, and, therefore, a

21     more deferential standard applies, and we should be treated

22     better.  But what am I to make of the fact that there's at

23     least partly ownership and client relationships between

24     Prime and some of the plaintiffs in this case?  Is it really

25     as binary as party, non-party in the sense of sued or not

1       sued in this lawsuit?  Or is it -- can I take into account

2       grayer areas where the party receiving the subpoena, while

3       legally incorporated and, you know, the corporate lawyers

4       have done their job and this is a separate legal entity,

5       but, nevertheless, Prime has -- Prime has an interest in the

6       outcome of this litigation.  Is that a fair statement?

7               MS. MCCALMONT:  I don't believe that is a fair

8       statement, Your Honor.  It is true that Prime is owned in

9       part by -- Prime has owners and it has clients.  And some of

10      the owner-clients that it has are plaintiffs in this

11      litigation.  But Prime also has owner-clients who are not

12      plaintiffs in litigation in this case or others around the

13      country, and it has lots of clients who are not owners at

14      all.  And because of those different layers of ownership and

15      clientness, Prime is intended to be and is an independent

16      entity.  It operates separately.

17               So it is not the case, for example, that if -- I'm

18      not aware of anyone ever suggesting or any evidence that

19      would show that if the plaintiffs were to recover in this

20      litigation, that Prime has an interest in that outcome.

21      Prime is not a party, is not a plaintiff, has not sued on

22      this and does not stand to benefit financially, which

23      interestingly in some of the cases that CVS cited was the

24      kind of interest that the Court was looking at, is is there

25      a financial interest in the outcome, and there really isn't

1        here.  So I do think that that's important.

2               To go back to how Your Honor framed the question

3        originally, of course I don't think it's binary, as simple

4        as party, non-party, and I recognize that Prime's connection

5        to the underlying factual circumstances in this case

6        certainly could shade it more in the direction of someone

7        who has an interest.  But with all of that said, I think

8        under the case law that CVS has provided, Prime really isn't

9        an interested party and so is entitled to the protections of

10       Rule 45 like any other non-party.

11              THE COURT:  Okay.  Thanks.  That's all the

12       questions I've got at this point.  Thanks.

13              MS. MCCALMONT:  Thank you.

14              So from Prime's perspective, there are a number of

15       problems with the request to produce these documents in

16       response to Request 2.  So one issue is, as framed, the

17       documents are equally available from the plaintiffs.

18              Perhaps, more importantly, these materials are

19       very much the most confidential documents that Prime has.

20       This is Prime putting forward a proposal to a plaintiff or

21       to a health plan saying, This is how we would be able to

22       help you.  So it includes information like Prime's pricing

23       methodologies.  It includes everything about Prime's

24       business structure, how it's a value add.  Everything about

25       how Prime runs its business and operates in the marketplace

 1      is included in these documents which run to hundreds of

 2      pages.  The overwhelming majority of which, even in the ones

 3      that include the words "U & C," have nothing to do with the

 4      subject matter in this litigation.  And so these documents

 5      are ones that Prime takes great care to protect and wants to

 6      continue to take great care to protect and has very genuine

 7      concerns about turning over to anyone, but certainly to CVS

 8      that -- which is a company that owns a direct competitor of

 9      Prime in CVS Caremark.

10              THE COURT:  There is a protective order in this

11      case, though, is there not -- in the Rhode Island case, I

12      mean?

13              MS. MCCALMONT:  There is, Your Honor.  We have

14      some concerns about whether the protections in the

15      protective order would be sufficient.  So, specifically,

16      there are -- when I was looking at it, there are some -- for

17      example, the parties can reveal information that is

18      designated highly confidential, outside counsel's eyes only,

19      to experts.  And something that I know has been an issue

20      before could be an issue is if the experts who are retained

21      are ones who are employees or affiliated with Prime's

22      competitors.

23              THE COURT:  Okay.  I mean, and I -- and I take

24      that as a legitimate concern, but is the answer to that

25      legitimate concern to have me shade the outcome of this

1    motion one way or the other, or is the appropriate remedy to

2    go and see my counterpart in Providence and say, This

3    protective order needs to be tuned up?

4           MS. MCCALMONT:  That's fair, Your Honor.  I think

5    if Your Honor directed us to produce any part of the

6    documents that are responsive to this RFP, we would take up

7    questions about the protective order with CVS and

8    potentially with the Judge in Rhode Island.

9           THE COURT:  Okay.

10          MS. MCCALMONT:  But to go back to just the very

11   foundational point, Your Honor, Rule 45 permits the quashing

12   of subpoenas that require the disclosure of confidential

13   information.  We think that's appropriate here both because

14   of the sensitivity of the information and because of the

15   overwhelming irrelevance based on our good-faith preliminary

16   review of the materials that these represent.

17          At a minimum, if Your Honor was inclined to order

18   us to produce something, we would ask that it be limited to

19   the 236 documents that hit on the U & C search term.  I

20   actually -- it's not clear, but from the response in CVS's

21   motion papers, it seemed to me like they might be agreeing

22   that that would be appropriate.  And even so limited, we

23   would ask that we be permitted to redact the portions of

24   those documents that do not contain information that is

25   relevant to the underlying case given its sensitivity and

1      its irrelevance.

2              THE COURT:  All right.  You also wanted to talk

3      about cost shifting and the motion to compel.  Am I right?

4              MS. MCCALMONT:  Yes, Your Honor.

5              THE COURT:  Okay.

6              MS. MCCALMONT:  So on the cost shifting point, so

7      I'll start by noting I was just looking this morning again

8      and Prime has already spent more than $50,000 responding to

9      CVS's subpoena.  We are not seeking to recover those costs

10     or to have those costs shifted, but I do think that's an

11     important background point for the request here, which is

12     that CVS be directed to bear all or some of the costs of

13     compliance for the remainder of the subpoena, which, by our

14     calculation and from estimates received from our vendors,

15     which we put into our briefing, we think will be well in

16     excess of $100,000 to review what it turns out is something

17     closer to 67,000 documents.

18             THE COURT:  Is that over and above the 50,000

19     already spent, or is that an additional 50,000?

20             MS. MCCALMONT:  It's 100,000 over and above the

21     50,000 already spent.

22             THE COURT:  150,000 total?

23             MS. MCCALMONT:  Yes.

24             THE COURT:  Estimate.  Understood.

25             MS. MCCALMONT:  Yes.

1              THE COURT:  Okay.  Thank you.

2              MS. MCCALMONT:  So, once again, cost shifting is

3     appropriate under Rule 45(d) which requires protection from

4     significant expenses associated with costs of compliance

5     with a subpoena, as well as allows for sanctions related to

6     things like bringing motions like this one, which we are

7     also asking for here.

8              In addition to being appropriate under the rule,

9     we think that cost shifting is appropriate under this

10    Court's precedent, including the *Rochester Drug* case, which

11    I know Your Honor is well familiar with, as well as the *West*

12    *Publishing* case.  *Rochester Drug* allocated 80 percent of the

13    costs for some of the compliance, *West Publishing*

14    50 percent.

15             In response to our request for cost shifting, CVS

16    makes a number of points.  I'll address them just very

17    briefly in advance.  I may have more to say after CVS's

18    counsel speaks of course.

19             THE COURT:  I'm sorry.  I didn't hear that last --

20    is the microphone close to you?

21             MS. MCCALMONT:  I can move it closer, Your Honor.

22             THE COURT:  Yeah.

23             MS. MCCALMONT:  Is this better?

24             THE COURT:  That's much better.  Thank you.

25             MS. MCCALMONT:  Yes.  Sorry.

1          So I said I'll just address very briefly, since we

2     did not have a reply, some of the points that CVS makes in

3     their opposition.

4          So one is CVS says that Prime is a company.  It's

5     not an individual.  It can bear these costs.  Interestingly,

6     some of the cases that CVS cites again talk about not just

7     the costs -- whether the costs can be borne by the recipient

8     of the subpoena, but whether the recipient can bear those

9     costs better than the issuer.  And in this case while it

10    might be true that Prime is a company, CVS is an even bigger

11    one; when I looked this morning, Number 4 on the Fortune

12    500.  So to the extent there is relative resources

13    associated with being able to bear the subpoena costs, I

14    think it's clear that CVS can bear those costs better than

15    Prime can.

16         Another point is that CVS says a number of times

17    that Prime is already undertaking review of these documents.

18    Prime has gotten subpoenas in other cases.  Prime is a

19    third-party defendant, at least for the time being, in a

20    couple of cases.

21         So one response to that is that the documents, the

22    custodians, the search terms in those other cases are not

23    perfect overlaps with the requests that CVS has made here.

24    They are different.  There is overlap.  I want to be clear

25    about that, but they are not exactly the same.

1          THE COURT:  All right.  Did you run ratios on

2     those?

3          MS. MCCALMONT:  No, Your Honor.

4          THE COURT:  Okay.  I'm smiling under my mask,

5     but -- I'm just wondering if the methodology you used to

6     gauge irrelevance could also be used to gauge tightness of

7     fit, let's call it, between requests in other litigation and

8     this one, but, okay.

9          MS. MCCALMONT:  Sure.  So part of the issue with

10     that, Your Honor, would be that the cases are at different

11     stages.  So in one case, the *Strauser* case, Prime made a

12     production a number of years ago, so that one is done.  But

13     we're -- the negotiations and productions in response to a

14     subpoena in the *Rite Aid* case that CVS cites is -- are still

15     ongoing and the negotiations are very much in their

16     preliminary stages for the *Walgreens* case.

17          THE COURT:  Okay.

18          MS. MCCALMONT:  Which is one of the ones where

19     Prime is a third-party defendant.

20          And I also just wanted to say that to the extent

21     that CVS believes that Prime will undertake this work

22     anyway, this is a genuine offer.  If CVS wanted, we would

23     give them the productions from the *Walgreens* case, from the

24     *Rite Aid* case.  They wouldn't have to bear any of the costs

25     associated with our review and production here, and we

1    wouldn't have to incur any additional costs.

2          So, you know, again -- and, in fact, at least with

3    respect to the *Walgreens* case, that's something that CVS

4    asked for.  One of their subpoena requests is for the

5    productions that we make in the *Walgreens* case, and they

6    have said that there's substantial overlap between what they

7    have asked for and what Walgreens has asked for.  And if

8    that's true, frankly, we think CVS should be willing to wait

9    and get our production in *Walgreens* and call it a day

10   without imposing those additional costs on Prime to review

11   things here.

12          We already touched on as well, so I won't repeat

13   it, a little bit about why we don't think Prime is an

14   interested party here as that phrase is used under the

15   rules.

16          But, again, at base, Your Honor, CVS is asking

17   Prime to spend a lot of money and a lot of time to review

18   documents and to produce them, and simply we think that CVS

19   should be willing to bear some of that cost.

20          I'll turn to the motion to compel unless

21   Your Honor has --

22          THE COURT:  No.  I have no questions at this time.

23   Thank you.

24          MS. MCCALMONT:  Motion to compel will be fast.  We

25   think it's moot so --

1          THE COURT:  I was going to ask update me, please,

2     on the status of the motion to compel, because it looks like

3     again there was negotiation, meeting and conferring going

4     on, and I did wonder whether some or all of it might be

5     moot.

6          MS. MCCALMONT:  Yes, Your Honor.  From Prime's

7     perspective, it is moot.  The part of the motion -- or the

8     part -- the motion to compel related to Request 16 --

9          THE COURT:  Uh-huh.

10          MS. MCCALMONT:  -- which has two different

11     components, sort of.  The component that was the subject of

12     CVS's briefing related to alleged communications between

13     Prime employees and plaintiff employees about claims data.

14     As we said we would in our motion papers, we tracked the

15     answers to all of that down.  It was somewhat complicated

16     because -- it was somewhat complicated, but we tracked it

17     all down.  And at the end of the day, we have told CVS that

18     Prime does not have nonprivileged materials to produce in

19     response to that request, and that we will log any materials

20     over which we assert privilege in compliance with the rules

21     so that CVS can assess the privilege and decide whether they

22     want to contest that.  But, in any event, there's nothing

23     for us to produce in response to the part of the request

24     that was the subject of CVS's motion.

25          THE COURT:  But there might be if CVS gets back

1    and says some of your privilege claims are not well-taken?

2              MS. MCCALMONT:  Yes.  We believe our privilege

3    claims are extremely well-founded.

4              THE COURT:  I'm sure you do.

5              MS. MCCALMONT:  Yes, correct.

6              THE COURT:  But someone might disagree.

7              MS. MCCALMONT:  Yes, Your Honor.

8              THE COURT:  Okay.  All right.  But outside of that

9    scenario, the motion to compel is, from your client's

10   perspective, moot at this point?

11             MS. MCCALMONT:  Yes, Your Honor.

12             The other part of the motion to compel, after the

13   briefing here was done, CVS raised a question about a search

14   term that Prime had thought was off the table that would be

15   responsive.  To the extent that that's part of what's going

16   on here, we think that's part of what we were moving to

17   quash with the cost shifting.  It would be another -- when I

18   said earlier that it's close to 67,000 documents, it's the

19   addition of those additional documents --

20             THE COURT:  I see.

21             MS. MCCALMONT:  -- in response to an additional

22   search term that I was referring to.

23             THE COURT:  Okay.  All right.  All right.  I have

24   no further questions at this time.

25             MS. MCCALMONT:  Thank you, Your Honor.

```
 1                    THE COURT:  Thank you.

 2                    Mr. Geyerman.

 3                    MR. GEYERMAN:  Yes.  Is it okay if I use the

 4       podium?

 5                    THE COURT:  It's fine, yes.

 6                    MR. GEYERMAN:  All right.

 7                    THE COURT:  Wherever you are comfortable.

 8                    MR. GEYERMAN:  Okay.  Thank you and good

 9       afternoon.  Thank you for making time for us.

10                    CVS is here to ensure that it receives important

11       discovery from an extremely important third-party witness.

12       And we ought to receive that discovery, we believe, under

13       the same terms that any litigant in Federal Court should

14       receive them, which traditionally is you don't have to pay

15       for a third party's costs to go and find documents and

16       produce them.

17                    CVS is a defendant in five identical lawsuits all

18       consolidated for discovery; 22 insurance plaintiffs, 12 of

19       them have used Prime as their PBM.  Roughly six or seven,

20       depending on the timeframe at which you measure, are owners

21       of Prime.

22                    Prime is not your traditional third party.  We

23       believe they are very interested in this litigation.  One,

24       from a keep-your-owner-happy perspective,

25       keep-your-client-happy perspective, but they are also now a
```

1    third-party defendant in identical litigation against

2    Walgreens where if there is liability found, where they

3    could potentially be found liable.  And so they are

4    certainly factoring that into their overall litigation

5    strategy, it would seem to us.

6          THE COURT:  No matter how this case, the Rhode

7    Island case comes out, Prime is neither going to get money

8    nor be made to paid money; is that accurate?

9          MR. GEYERMAN:  At this time no one is asserting a

10   claim in the Rhode Island litigation against Prime.

11         THE COURT:  So your argument is solely, look at

12   this web of relationships, they have got nonmonetary

13   incentives to participate in this litigation in a particular

14   way.

15         MR. GEYERMAN:  Yes.  As an example of that,

16   counsel mentioned that with respect to the Request 16, which

17   is the subject of our motion to compel, that they have no

18   nonprivileged documents that relate to communications about

19   this action.  The communications that we were told existed,

20   told this by the plaintiff, would have been plaintiff to

21   Prime communications.  Those are not communications within a

22   plaintiff or within Prime.  By definition, they are a

23   communication that went outside the two entities.  So it

24   must be that they are going to assert a joint defense

25   relationship over those documents as the basis of calling

1    them privileged.

2              So I take that as evidence -- I'm sorry.

3              THE COURT:  So you've heard from the plaintiff

4    that we've had these communications with Prime, and then

5    Prime says, Everything we've got is privileged.  And so you

6    are saying the plaintiff is accurate and Prime is not?

7              MR. GEYERMAN:  No.  I'm not taking a position on

8    the accuracy or inaccuracy of the privilege assertion.  What

9    I'm saying is I'm using the fact that they must be going to

10   be asserting joint defense privilege over those

11   communications as evidence that Prime is not a disinterested

12   third party in this case.

13             THE COURT:  No.  I understand that point.  I guess

14   where I was going, you said these are communications from

15   plaintiffs to Prime.  That suggests to me that those

16   communications can be gotten from the plaintiff without the

17   need for a subpoena to Prime, and also that that would

18   further apply to RFP Number 2 because Prime, in that case,

19   is responding to requests for proposals, and those RFPs came

20   from the plaintiffs, so, presumably, Prime responded to the

21   plaintiffs.  I mean, if they get an RFP from Joe, they are

22   not going to reply to Stanley.

23             MR. GEYERMAN:  It's a fair comment.  I will make

24   this observation.  I think it's important to separate the

25   two requests.  Let's talk about the RFPs first.

1          THE COURT:  Okay.

2          MR. GEYERMAN:  The RFPs were -- at least Prime had

3    a very easy time finding them.  They said, We found these

4    1,200-plus RFPs.  We then ran some search terms and the

5    number is down in the 200s.  They apparently collected them

6    and saved them in some isolated place.

7          The plaintiffs -- we've definitely asked for these

8    documents from the plaintiff.  And we have received some.

9    But we have received a complete patchwork of the RFP

10   responses.  Some have more than others.  Some only have them

11   from the last couple of years.  They don't go back to 2008,

12   which is sort of the beginning of the CVS program at issue.

13         We're the defendant.  We got sued in 2020 over

14   conduct that goes back to, you know, before 2010, several

15   years before that.  And so we're doing the best that we can,

16   but different companies had different document retention

17   practices.  And so we went to Prime and said, If you have

18   these, you should produce them to us.  We've asked the

19   plaintiffs for them too, but there's no guarantee what we're

20   going to get out of it.  And so we have, frankly -- Prime

21   has a lot more, it has turned out, in terms of preserving

22   these RFP responses than the plaintiffs have themselves.

23         So there's no principle of law that says I'm

24   prohibited from going after the two sources that I know at

25   one time had the document.

1            THE COURT:  I agree with you --

2            MR. GEYERMAN:  Yeah.

3            THE COURT:  -- that there's no principle of law.

4    There is, though, in Rule 45, I would say, a special

5    solicitude for people who receive subpoenas and who are

6    in -- you know, if you are in a lawsuit, you are in a

7    lawsuit.  But if you are not in a lawsuit and you are

8    dragged in, then the Rules of Civil Procedure give you

9    special, well, solicitude.

10            MR. GEYERMAN:  And I acknowledge that.  And let me

11    just clear the air a little bit.  We will accept the 200

12    and --

13            THE COURT:  I was going to ask.

14            MR. GEYERMAN:  -- 36, all right?

15            THE COURT:  All right.  So I can check that box?

16            MR. GEYERMAN:  We don't have time at trial to

17    introduce 1,000 of these; right?

18            THE COURT:  Uh-huh.

19            MR. GEYERMAN:  But the 200 and change -- the 236

20    that they have identified, we believe we should receive it

21    without redaction.  There are many different issues that

22    these RFP responses speak to.  I can tick them off.  They'll

23    explain what Prime's understanding of usual and customary

24    pricing means.  Maybe it says, does it include or exclude a

25    membership program or discount card, the core issue in the

1   case.  If Prime does not make a representation in winning

2   the business to the plaintiffs that they will always receive

3   the lowest price that's out and available in the

4   marketplace, that is a very significant fact for us because

5   that's part of our defense in the case is that this price

6   that was made available to people that bought into a special

7   club, that was not a price anybody else was entitled to if

8   they hadn't joined the club.

9          And so in our litigation of these cases for CVS

10  for the last six to seven years, we've never seen a PBM make

11  a representation to a potential client when winning the

12  business that says you will get the lowest price always if

13  you select me as the PBM.  And the RFP responses are the

14  evidentiary mechanism to prove that point.

15         THE COURT:  I don't think that Prime is taking

16  issue with the topics in the Rhode Island litigation that

17  the 236 documents will be used for.  They are taking issue

18  with the fact that some of the experts that you, under the

19  protective order, can share them with are -- I don't know if

20  it was CVS employees, but certainly people who are a little

21  too close for comfort to CVS's C-suite.

22         MR. GEYERMAN:  Okay.  I heard that argument today.

23  I hadn't heard it before.  We amended the protective order

24  in this case a second time at the PBM's behest.  The

25  plaintiffs told us the PBMs want you to add an outside

1    counsel's eyes only layer of confidentiality because we were

2    getting into the issue of RFPs.  And we added that third

3    layer.  So my client can't even see these documents.

4            THE COURT:  Right.

5            MR. GEYERMAN:  Only Mr. Guiang and myself can see

6    these documents.

7            If there's an issue about experts, I think we can

8    work through it.  We, frankly, I think, made a

9    representation in other cases in this same sort of

10   litigation that experts that we're working with aren't

11   actively working with any PBMs or pharmacies in the

12   industry, and I don't see why we couldn't make that again.

13           Obviously we -- until such time as an expert's

14   identity is disclosed, I don't -- I'm not going to commit to

15   disclosing identities of experts, but we have never had a

16   problem working through this issue before despite having to

17   subpoena all the biggest PBMs.

18           THE COURT:  So this issue has come up before?

19           MR. GEYERMAN:  The issue of there's a concern

20   that, you know, this is highly confidential information to

21   other PBM companies, that has been worked through before.

22   And I can't remember precisely how we handled it in another

23   Rhode Island case, but it's not a reason to deny the

24   discovery.  It's a logistical issue that, again, I hadn't

25   heard until today, but I'm confident we can work through it.

1     It certainly isn't a basis to deny discovery.  We have the

2     highest level of protection I've ever seen in my practice in

3     three layers of confidentiality in the current protective

4     order.

5          So we would want these 236 RFPs, no redactions.

6     They can use the highest level of confidentiality, fine.

7     And if they have some other concern about experts, I'm

8     willing to discuss that with them, and I'm confident we can

9     work out a solution.  That's all I really can say on the

10    236.

11          THE COURT:  No.  I understand that.  I'm trying to

12    form a question, and here -- let me state my concern

13    instead.  When I rule on this, I want to rule on it and, you

14    know, you're great people, but I want to say good-bye.

15          MR. GEYERMAN:  Yes.

16          THE COURT:  I don't want to come back on have we

17    sufficiently accommodated the experts.  And I'm trying to

18    think of a mechanism for dealing with that in this, but

19    that's for me to worry about after this hearing.

20          MR. GEYERMAN:  My recollection, and, again, I'm

21    doing this off of recollection, I believe that in another

22    case before this same judge in Rhode Island, we -- we told

23    the third parties that our experts were not, like, currently

24    employed with any PBM or pharmacy.  And, you know, a lot of

25    them are consultants so this is their bread and butter.

1    They are experts in this.  And so they are going to have

2    consulting clients.  But nobody is an employee, and,

3    therefore, you know, getting their paycheck from the PBMs.

4    So I don't know if a similar sort of representation to

5    the -- to Prime here will do that.  I'm not -- you know, I

6    can't speak to that.

7              THE COURT:  I understand.  I understand.  Okay.

8              MR. GEYERMAN:  Okay.  So as to the second bucket

9    of documents you're being asked to deal with, this is what

10   in our brief we call the 64,000 documents identified by the

11   search terms.

12             This is not an unreasonable volume of documents to

13   ask a third party, like Prime, to review in this case.  They

14   go to the most core issues.  The most core issue in the

15   case, what does usual and customary mean, and do membership

16   programs and discount cards fit in that definition or not?

17   This pool of documents satisfies four different requests in

18   five different cases brought by 22 insurance companies.  So

19   four times five, you could in some way consider this

20   satisfying 20 requests that could have been served on Prime

21   had each of these insurers filed their own separate lawsuits

22   against CVS.

23             Prime reviewed 28,000 documents in one case

24   against Rite Aid.  We're asking them to review 64,000

25   documents in five cases against CVS.  And the *Rite Aid* case

1    didn't even involve Blue Cross plans that were suing the

2    captive clients of Prime, suing the defendant, whereas they

3    are here.  So I think even by sort of their own historical

4    conduct, we're not out of the realm of reasonableness in

5    asking them to review it.

6              As a point of comparison, I know Your Honor is

7    familiar with Caremark, the PBM from your EpiPen litigation.

8              THE COURT:  I am.

9              MR. GEYERMAN:  That's my same firm.  Caremark is a

10   third party in this litigation.  Caremark is the PBM for I

11   believe three of the Blue Cross plaintiffs.  Caremark has

12   reviewed over 218,000 documents in response to third-party

13   discovery in this case, and they've produced well over

14   30,000 documents already to date.  So as a point of

15   comparison, PBMs are a rich source of documents in these

16   cases.

17             THE COURT:  Yes, they are, and they complain

18   mightily when they are subpoenaed, including Caremark.  I

19   mean, you know, it's in the papers that you protested the

20   3,620 documents was unduly burdensome, and now 65,000

21   isn't --

22             MR. GEYERMAN:  And I'm glad you brought that up.

23   The reason we opposed that, Your Honor, was because in that

24   case we'd already performed two other ESI searches, and so

25   the disputed issue was we thought we were done.  We thought

1    we'd made a deal.  And they came back a third time and said,

2    Now we want you to run this.  And in the opening

3    introduction of the briefing that they attached, we say,

4    enough is enough.  At some point we had to draw the line.

5    So the volume that was at issue there, yes, was 3,000

6    documents, but that's because it comes on the third search

7    that had been performed in that case.  So it's not at all --

8    it's not all analogous.

9            And, by the way, we had to do it.  We had to pay

10   our own costs.  We had to do it within 30 days.  So, yes,

11   it's not easy to get documents out of these PBMs, but they

12   are absolutely the fulcrum of these transactions, and they

13   are the way to defend themselves -- for the pharmacies to

14   defend themselves.

15           There's significant overlap with the documents

16   asked for in the *Walgreens* case.  In preparation for today,

17   we spoke with Walgreens' counsel earlier this week.  Our

18   understanding is that 9 out of the 11 custodians that we've

19   asked for here are custodians that are going to be

20   custodians in the *Walgreens* case.  So we're talking about

21   the same people.

22           Exhibit ECF Number 23-11, which was our Exhibit K

23   to our motion, was a side-by-side comparison of the two

24   document requests.  The *Walgreens* ones are broader, but in

25   substance, we're getting at the same nub of the same

1    documents.

2          THE COURT:  And did I hear correctly that just a

3    few minutes ago plaintiff offered to give you the *Walgreens*

4    production?

5          MR. GEYERMAN:  Well, that was the first offer I'd

6    heard about it.  Here's part of the problem.  We can't

7    control the schedule in the *Walgreens* case.  We're under a

8    schedule in this case that, as of today, has an end of fact

9    discovery at the end of October.  What has become clear to

10   us over the last about 45 days is that whoever -- the

11   counsel representing the Blues in the *Walgreens* case also

12   represents the Blues in *Rite Aid*, and they seem to be

13   driving the schedule.  And the counsel who's suing CVS,

14   because that other counsel is conflicted against CVS, is

15   taking their marching orders on the schedule from the other

16   national counsel.

17         And so even though our judge is setting short

18   deadlines on us, we're not getting the documents out of the

19   plaintiffs and out of Prime really on our schedule because

20   the *Walgreens* schedule is getting extended.  To the extent

21   that just about two weeks ago the *Walgreens* date got

22   extended to the end of April, an hour before this hearing,

23   we got an e-mail from our plaintiff saying, Hey, can we

24   extend the new discovery schedule to match what the

25   *Walgreens* schedule is?  And now we hear counsel for Prime

1    say if they just want to wait until they get the document

2    production from the *Walgreens* case, we can't like -- at this

3    point, we can't wait.  We're litigating our own case.  We

4    were first so we had to do it.

5              And so I don't know when I'm going to get the

6    *Walgreens*.  I'm not a part of those negotiations firsthand,

7    so I think I'm entitled to both of this.  I'm entitled to

8    get what I've negotiated for or what I'm trying to get with

9    the 64,000 documents now, and then if there's more stuff

10   that gets produced in the *Walgreens* case down the road, then

11   they can produce that to us.  No burden either.

12             But I don't even know when the *Walgreens*

13   production would be done, so it's really hard for me to

14   evaluate that offer about just take the *Walgreens*

15   production.  At this point --

16             THE COURT:  Right now, though, in Rhode Island,

17   your fact discovery closes with the end of October?

18             MR. GEYERMAN:  Yes.  Yes.  And both sides I think

19   have acknowledged that that is not realistic to hold.

20   However, we've waited because nothing gets stuff done like a

21   deadline.  And so we didn't want to move it until we

22   absolutely had to.  And tomorrow, September 30th, was

23   supposed to be the Blues plaintiff's deadline to

24   substantially complete their production, at which point, we

25   thought we could make an informed judgment about how long an

1    extension was realistic.

2            THE COURT:  So at this point, you have not taken

3    depositions -- moved to the deposition phase?

4            MR. GEYERMAN:  We've taken one deposition.  It was

5    of a plan that doesn't use Prime because --

6            THE COURT:  You are going to take more

7    depositions.

8            MR. GEYERMAN:  Oh, there's going to be quite a

9    number of them, yes.

10           THE COURT:  You are not going to get them done by

11   the end of October, so that is going to move.

12           MR. GEYERMAN:  Correct.  Correct.

13           But to respond to the offer of getting the

14   *Walgreens* production, I'm not in a position to make that

15   judgment now.  I just don't know enough about when that's

16   going to happen.

17           THE COURT:  Let's say that hypothetically you can

18   get the *Walgreens* production tomorrow.  Satisfied?

19           MR. GEYERMAN:  Yes.

20           THE COURT:  Okay.  I just wanted to know what part

21   of this was timing and what part of this was substance.  And

22   it sounds like it's timing.

23           MR. GEYERMAN:  Yeah.

24           THE COURT:  Okay.  No.  That's fair.

25           MR. GEYERMAN:  Yeah.

1          THE COURT:  That's all I wanted to know.

2          MR. GEYERMAN:  On the -- so I just want to make

3      sure we discuss the actual elements of the legal tests for

4      cost shifting --

5          THE COURT:  Uh-huh.

6          MR. GEYERMAN:  -- since that will be part of the

7      analysis.  CVS is a huge company.  Prime is a huge company.

8      So -- but the burden is on them to prove that it would be

9      unfair and they don't have the resources to complete the

10     third-party discovery that they need.  And they can't make

11     that showing and haven't even really argued that they can

12     meet that showing.  So it certainly doesn't prove that CVS

13     should pay for it.  It's their burden.  We've answered tons

14     of third-party discovery and been a defendant in a lot of

15     these cases, but this is the first time we've ever asked

16     them to produce anything in any of these cases.

17          I just want to point out the *Cornell* case in our

18     brief --

19          THE COURT:  Uh-huh.

20          MR. GEYERMAN:  -- as evidence that even there

21     where the third-party subpoena recipient was estimated they

22     would incur in excess of $220,000 to comply with the

23     subpoena, the Court didn't shift costs.  It was a big

24     company.  I believe it was FedEx.  So this is -- you're not

25     like out of bounds or doing something unprecedented in

1    saying no just because we're talking a six-figure compliance

2    number, then costs needed to be shifted.

3             I'll finally address the cross-motion to compel,

4    Request 16.

5             THE COURT:  Sure.

6             MR. GEYERMAN:  The only -- so I guess we have to

7    wait for the privilege log on the documents they represent

8    to us are privileged.  But in counsel's brief opposing our

9    motion to compel, they made the assertion that they ran a

10   search and got no hits.

11            As I read, Your Honor, their ECF Number 4-3, this

12   was their Exhibit C, there was one term -- one search term

13   that they ran for the purpose, as I understood it, of

14   identifying documents related to this case, and that's CVS

15   within three of, and then they list all the plaintiffs, and

16   they limited it to the date that the first lawsuit was filed

17   through the present.  And they said they found 2,450

18   documents.  And so if they have those, we believe they ought

19   to review those.  It's addressing a different request for

20   production.  It's not the request for production about what

21   does usual and customary mean and what's your position on

22   membership programs.  That's the four requests that relate

23   to those 64,000 document terms.  Those are the ones that

24   overlap what the *Walgreens* case requests.  But if they have

25   2,400 documents that are about CVS and the plaintiff in the

1    window of time when this case has been pending for the last

2    two years, we believe we should get those.

3                    THE COURT:  All right.  All right.  Thank you very

4    much.

5                    MR. GEYERMAN:  Thank you, Your Honor.

6                    THE COURT:  All right.  Brief response.

7                    MS. MCCALMONT:  Yes, Your Honor.  Very briefly.

8    So --

9                    THE COURT:  Start with the 2,400 documents.  That

10   caught my attention.

11                   MS. MCCALMONT:  I'm sorry.  Say that again.

12                   THE COURT:  The 2,400 documents, I must say,

13   caught my attention.

14                   MS. MCCALMONT:  Sure.  So the issue there,

15   Your Honor, is that there was a miscommunication between us

16   and CVS's counsel, I guess, in the sense that we believed

17   that we were negotiating the search terms that they wanted

18   us to run against custodians for their entire set of

19   subpoena requests that were not just sufficient to show

20   documents.  So we have already made an effort to collect and

21   produce I think it's over 500 pages of documents in response

22   to a number of their requests that were separate from the

23   ones they wanted us to apply search terms to.

24                   The e-mails back and forth on this point are all

25   exhibits to the briefing.  We reached a point where we said,

1    Are these the final search terms and custodians, throughout

2    we had reserved our right about the fact that this was

3    burdensome, and they said yes.  And this search term that

4    they have now identified was not on that list.  It was a

5    search term the parties had discussed earlier in the process

6    but not one that had been part of this this is our final set

7    of search terms.  So, again, I don't think there's any ill

8    will here, but our understanding was that the search terms

9    they had provided were all of the search terms that they

10   wanted us to run.  And after this briefing was complete,

11   they came back and readded this one that generated the 2400

12   documents.

13           If we had understood that to be part of the search

14   terms they were requesting, I think it actually is fairly

15   part of our motion to quash because our intent was to cost

16   shift for all of the search term review process.  And so I

17   don't believe that that 2,400 documents is separate.  We

18   just didn't understand them to be pursuing that request

19   until very recently.  Is that sufficiently responsive on

20   that point?

21           THE COURT:  That's a sufficient response.  Yes.

22           MS. MCCALMONT:  So, again, we think that's part of

23   the motion to quash then, and, therefore, the motion to

24   compel is still moot and can be denied on that basis.

25           To go back to RFP 2 just very briefly, I just

1    wanted to have clarity on one point, which is that with

2    respect to the 236 documents, to the extent that Prime is

3    going to be asked to review those, it is -- as we sit here

4    today, we're not agreeing that those 236 documents are all

5    responsive and relevant and should be produced.  We think

6    that's the set that should be reviewed.

7          So our experience in this shades into the

8    experience with the 64,000 as well, is that there's an issue

9    caused by the fact of how the U & C search term is used.  So

10   usual and customary pricing or the U & C price is part of

11   every single transaction that Prime adjudicates.  It is a

12   term that is all over everything.  Almost nothing of that

13   has to do with the issues in the CVS litigation or in the

14   other litigation which is about the impact of pharmacies'

15   discount programs on the U & C price.

16         So our experience is that what looks like a high

17   volume of responsive relevant materials becomes a very small

18   number of actually relevant materials once they are

19   reviewed, so I just wanted to clear that up because we do

20   think that we should still have the opportunity, we have not

21   yet, to review those 236 documents to determine whether they

22   are relevant on the theories that counsel has articulated

23   and to only produce relevant materials with irrelevant

24   information redacted.

25         One other just very small point of clarity.  I

1     think that counsel said that the protective order was

2     amended at the PBM's request.  I don't know which PBMs, but

3     Prime has not been part of discussions about the CVS

4     protective order, so we would want to have the opportunity

5     to talk about the issues we raised today.

6             THE COURT:  All right.  And then a question.  When

7     will the *Walgreens* production be ready?

8             MS. MCCALMONT:  So -- so I don't yet know,

9     Your Honor.  We are -- I think we have reached agreement on

10    custodians, and we've made good progress on search terms.

11    The *Walgreens* case just was subject to a six-month

12    extension, so it will be at some point in the next six

13    months.  I think it will be significantly sooner than that,

14    but we don't yet have the final volume that Walgreens -- we

15    haven't reached agreement on what we're going to be

16    reviewing and haven't collected all those documents yet.

17            With all of that said, what I just -- I wanted to

18    underscore a couple of points about what CVS' counsel said

19    here.  One was the plaintiffs just asked for an extension

20    that would put their case on the same track as the Walgreens

21    case, which I think underscores, again, why it would be

22    appropriate to allow Prime to do that production and for

23    counsel to accept it, as they said they would, as opposed to

24    imposing an entirely separate set of the costs related to

25    compliance with the CVS subpoena now.

1          On that -- on the point of timing that counsel

2     raised, counsel indicated that they spoke to counsel for

3     Walgreens in preparation for today.  I also think that -- I

4     don't think that CVS's counsel would fault us for how we

5     have communicated in this case.  We have been completely

6     transparent about what we're doing.  We have been completely

7     responsive every time they've asked a question.  So to the

8     extent that there are concerns that we would use this as

9     some opportunity to slow roll them, that is absolutely not

10    the case.  We are genuine in wanting to limit the burden on

11    Prime for compliance with the subpoena.  And so to the

12    extent that Prime is going to be undertaking a separate

13    process that is sufficient for CVS's purposes, we think it's

14    appropriate to allow us to do that and to not have to do two

15    separate reviews and productions.

16          THE COURT:  Well, if the *Walgreens* production is

17    going to be some, you know, five, six months out, the offer

18    could be that Walgreens gets what you produce to CVS.

19    Right?

20          MS. MCCALMONT:  I don't think that it's likely to

21    work that way, Your Honor, just based on preliminary

22    conversations with Walgreens, because I think Walgreens

23    wants more than what CVS wants from their preliminary

24    discussions, so I don't think they would accept what CVS

25    wants.  Like I said, there's overlap, but it's imperfect,

1    but Prime is currently a third-party defendant in that case

2    so their position is different and Walgreens is pressing for

3    a lot more, so I --

4           THE COURT:  So the offer to have the *Walgreens*

5    production turned over in this case is based on similarity

6    of requests and not on actual review of documents and --

7    that has been undertaken, because it sounds like Walgreens

8    is a long way from being finished?

9           MS. MCCALMONT:  So it is -- right.  It is based on

10   similarity of requests and discussions related to custodians

11   and search terms where we think there is overlap but, again,

12   not perfect overlap.  I think -- I guess I wouldn't agree

13   that Walgreens is a long way from being finished,

14   Your Honor.  We're making good progress.  We had a

15   conference with the Magistrate Judge in the Northern

16   District of Illinois a couple weeks ago, and she is

17   absolutely going to hold us to a schedule.  Again, as I sit

18   here today, I can't commit to a timeframe because we don't

19   have the volume of documents negotiated yet, but I think it

20   is not going to be five or six months before those documents

21   are produced.

22          THE COURT:  All right.  Anything further for

23   today?

24          MR. GEYERMAN:  Nothing, Your Honor.  I would just

25   say our volume of documents we're asking for is

1    substantially narrower than the *Walgreens*.  I think that

2    proves we're being reasonable and targeted in our request.

3              THE COURT:  Anything further for today?

4              MS. MCCALMONT:  No, Your Honor.  Thank you.

5              THE COURT:  All right.  This is going to have to

6    be the subject of a written order.  I am fond of ruling from

7    the bench, but I also want to make sure that I cover

8    everything, and so you're, I'm afraid, going to have to

9    wait.  I am aware that at least technically as of now we're

10   looking at an October 1st deadline in Rhode Island, but I'm

11   going to handle the case that's in front of me and not the

12   case that's in Rhode Island.  So I'm afraid you will have to

13   wait.  All right.

14             Thank you all.  I appreciate it.  It was a

15   pleasure, and Court is adjourned.

16       (Court adjourned at 2:50 p.m.)

17                      *     *     *

18

19

20             I, Erin D. Drost, certify that the foregoing is a

21   correct transcript from the record of proceedings in the

22   above-entitled matter to the best of my ability.

23

24             Certified by:  *s/ Erin D. Drost*

25                            Erin D. Drost, RMR-CRR